## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal Action No. 08cr10090-NG |
| ) | |
| CHARLES A. MANGHIS, ) | |
| Defendant. ) | |

GERTNER, D.J.:

## Table of Contents

## MEMORANDUM & ORDER RE:
## FINDINGS OF FACT AND MOTION FOR NEW TRIAL
May 26, 2011

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.     THE CRIMES CHARGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
        A.   Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        B.   Smuggling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        C.   False Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

III.    THE CONSPIRACY AND UNLAWFUL IMPORTATION COUNTS . . . . . . . . -11-
        A.   Mr. Manghis Imported the Items Listed in Counts Two Through Seven of
             the Indictment Without Declaring Them to Federal Officials. . . . . . . . . . -11-
        B.   Mr. Manghis Knowingly Effected the Illegal Importations Alleged in Counts
             Two Through Seven of the Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        C.   Mr. Manghis Willfully Entered into an Agreement with James Saunders and
             Andriy Mikhalyov to Import Sperm Whale Teeth Contrary to Law and That
             Mr. Manghis and His Co-conspirators Committed Several Overt Acts in
             Furtherance of Their Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
        D.   Mr. Manghis Knew That His Conduct Was Unlawful. . . . . . . . . . . . . . . -18-
        E.   The Defendant Was Not a Mere Purchaser. . . . . . . . . . . . . . . . . . . . . . . -28-

IV.     FALSE STATEMENT COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
        A.   Count 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
        B.   Count 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-
             a.   The Failure to Introduce Question Posed Was Not Error. . . . . . . -34-
             b.   The Statement Was Not Technically True . . . . . . . . . . . . . . . . . . -36-
        C.   Count 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

V.      LESSER INCLUDED OFFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

VI.     APPROPRIATE OFFENSE CHARGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

VII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 08cr10090-NG |
| | ) | |
| CHARLES A. MANGHIS, | ) | |
| Defendant. | ) | |

GERTNER, D.J.:

### MEMORANDUM & ORDER RE:
### FINDINGS OF FACT AND MOTION FOR NEW TRIAL
May 26, 2011

## I.    INTRODUCTION

Scrimshaw is the art of etching designs, figures, and patterns into the bones and teeth of whales.  See 16 U.S.C. § 1539 (f)(1)(B) (defining the term "scrimshaw product"); see also Oxford English Dictionary (2d ed. 1989).  The original scrimshanders (i.e., makers of scrimshaw) were whalers who practiced the art as a way of occupying their free time while at sea.  See Government's Trial Ex. 2.  Today, a small number of artists continue this tradition by carving their own designs into a stock of whale ivory that, thanks to laws designed to protect endangered species such as whales, is rapidly dwindling.  One of these modern-day scrimshanders is Charles Manghis ("Mr. Manghis"), the defendant in this case.

Mr. Manghis is extraordinarily accomplished in his art.  Since the late 1990s, he has supported himself and his family by selling his scrimshaw, mostly to the seasonal tourists of Nantucket, Massachusetts, where Mr. Manghis makes his home.  He has even created pieces of scrimshaw for John F. Kennedy, Jr., and both Presidents Bush.  See Curriculum Vitae, Charles A. Manghis, Def.'s Trial Ex. 1.  There was, however, a problem with Mr. Manghis' beautiful artwork.  The government alleges, and as described below, the Court has found, that Mr. Manghis knowingly imported whale and elephant ivory -- the media for his scrimshawing -- in

violation of United States law.  In addition, he lied to government agents once they uncovered his illegal activities.

Ivory is the commercial term given to the chemical compound found in the teeth and tusks of mammals such as whales and elephants.  Hunting animals for their ivory can lead them to the brink of extinction, and thus since at least the early 1970s, trade in ivory and other animal products has been tightly regulated.

For example, the United States, Ukraine, Great Britain, New Zealand, and approximately 170 other countries have signed the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 (entered into force July 1, 1975) [hereinafter "CITES" or "Convention"].  CITES seeks to protect species from extinction by subjecting trade in vulnerable species to differing degrees of regulation corresponding to the level to which the species' survival is threatened.  The most threatened species are listed in Appendix I to the Convention.  Such species and their body parts, like teeth and tusks, may only be imported if a permit is first obtained, and the importation cannot be for "primarily commercial purposes."  CITES, supra, arts. II, III.  Appendix II of the Convention lists species that are not currently on the brink of extinction but whose survival could be jeopardized without strict trade regulations.  Export or re-export permits must first be obtained before these species can be traded internationally. CITES, supra, arts. II, IV.  The sperm whale, the primary source of the ivory used by Mr. Manghis, is included in Appendix I, the highest level of protection.  CITES, as ratified by the United States, however, has no self-enforcement mechanism.  It is enforced by the Endangered Species Act, the Lacey Act, general criminal statutes, and a series of regulations.

The indictment in this case contains eleven counts.  Count one charges Mr. Manghis with conspiring with Andriy Mikhalyov, a seller of sperm whale teeth who lives in Ukraine, and

others to knowingly import sperm whale teeth into the United States contrary to U.S. law.[1]

Counts two through eight allege that on various occasions, Mr. Manghis knowingly imported

sperm whale teeth and elephant ivory contrary to law.[2]  Counts nine through eleven charge Mr.

Manghis with making various false statements during the course of the government's

investigation of his activities.

Mr. Manghis chose to waive his right to trial by jury, a decision with which the

government concurred.  The case was tried to the Court over the course of four days, from

January 25, 2010, to January 28, 2010.  See Fed. R. Crim. P. 23(a).  At the conclusion of the

bench trial, the Court announced that it had found the defendant guilty of counts one through

seven, nine, and ten.  The Court acquitted the defendant of counts eight and eleven.

The defense requested that the Court make findings of fact but before it could do so, the

defendant moved for a New Trial under Rule 33of the Federal Rules of Criminal Procedure.  See

Def. Mot. New Trial (document #110).  Then the defendant, represented by new counsel, filed

yet another new Motion for New Trial or Acquittal.  See Def.'s Mot. New Trial or Acquittal

(document #131); Gov't Mem. Opp'n (document #140).  I heard oral argument on that motion: At

that argument, I allowed the defendant to orally amend his Motion for New Trial to argue

additional claims for relief, including that the Court failed to give a lesser-included offense

instruction.  I then allowed the government to file a written response to the additional claims and

the defense to respond in turn.  See Gov't Second Opp'n (document #166); Def. Reply to Resp.

---

[1] Count one also accuses Mr. Manghis of conspiring to receive, conceal, buy, or sell (or facilitate the transportation, concealing, or sale of) sperm whale teeth, knowing that the teeth were imported contrary to law.

[2] Counts two through eight also accuse Mr. Manghis of knowingly receiving, concealing, buying, selling, or facilitating the transportation, concealment, or sale of the various wildlife parts listed in each count.

(document #167).  As the government has pointed out, in light of the unique posture of this case the Defendant has enjoyed an abundance of due process.[3]

The defendant makes five arguments for New Trial or Acquittal: (1) that there is insufficient evidence to convict Mr. Manghis of conspiracy because he was merely a buyer, and trial counsel was ineffective for failing to raise the buyer/seller defense; (2) that Mr. Manghis lacked the requisite intent to smuggle because he did not know the particularities of the Convention on International Trade in Endangered Species of Wild Fauna and Flora that require documents upon importation of lawful teeth; (3) that there is insufficient evidence to convict the defendant of making false statements because one statement was technically true and the other statement was offered in response to a question that is unknown or ambiguous; (4) the Court erred in failing to consider a lesser included offense and trial counsel was ineffective for failing to ask for that consideration; and (5) that the conviction should be voided because Mr. Manghis was charged under the smuggling act and not under the more specific Lacey Act.

According to Rule 33 of the Federal Rules of Criminal Procedure, I "may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment."  In this case, I was the fact finder; the defendant is essentially asking me to reconsider my verdict in light of his new counsel's presentation of the law and facts in his memoranda.

His burden is heavy, as motions for new trials or acquittal should be granted in only the rarest of circumstances.  See Romero v. United States, 28 F.3d 267, 268 (2nd Cir. 1994); see also United States v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010) ("[T]he remedy of a new trial is

---

[3] Because I find that the defendant's arguments fail on the merits, I need not consider whether they are procedurally barred as the government suggests.

sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." (internal quotations omitted)).  At this stage, I am to resolve every credibility dispute in the favor of the verdict.  United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1994).

In the alternative, the defendant asks that I determine that there was ineffective assistance of counsel and grant a new trial.  To prove ineffective assistance of counsel, under Strickland, the defendant must show not only that his counsel was ineffective but that he was prejudiced by the representation.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  In this case, the prejudice prong is easy to determine.  I will ask whether effective counsel would have led me to a different verdict.  I should note that while I too am concerned about the defendant's representation at trial, in light of the facts and arguments before me, I cannot say that I would have reached a different result had his representation been better.

This written opinion responds to the defendant's request for findings of fact under Federal Rule of Criminal Procedure 23(c).  Throughout, it addresses defendant's arguments for acquittal or new trial.  For reasons I describe, I DENY the Defendant's Motion for New Trial or Acquittal (document #131) in its entirety.

## II.    THE CRIMES CHARGED

The parties substantially agreed as to the elements that the government had to prove beyond a reasonable doubt to obtain a conviction on each count alleged in the indictment.

### A.    Conspiracy

To convict Mr. Manghis of count one, the conspiracy count, the Court had to find:

> **First,** that the agreement specified in the indictment, and not some other agreement or agreements, existed between Mr. Manghis and at least one other person to knowingly import wildlife products contrary to law (or receive, conceal, buy, sell, or facilitate the

transportation, concealing, or sale of wildlife products, knowing
that the teeth were imported contrary to law);

**Second,** that Mr. Manghis willfully joined in the agreement; and

**Third,** that one of the conspirators committed an overt act during
the period of the conspiracy in an effort to further the purpose of
the conspiracy.

See Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.371

(2009); see also 18 U.S.C. § 371 (making it a crime for "two or more persons [to] conspire . . . to

commit any offense against the United States"); 18 U.S.C. § 545 (setting forth the substantive

offense that the government charged Mr. Manghis of conspiring to commit).

### B.   Smuggling

To find Mr. Manghis guilty of the crimes charged in counts two through eight, the Court

had to find:

**First,** that Mr. Manghis knowingly imported into the United States
the various articles of sperm whale teeth and elephant ivory listed
in the indictment;

**Second,** that this importation violated U.S. law; and

**Third,** that Mr. Manghis knew the importation was contrary to
law.

See Fifth Circuit Criminal Jury Instructions § 2.31 (2001); Tenth Circuit Criminal Pattern Jury

Instructions § 2.30 (2005); see also 18 U.S.C. § 545 (setting forth the offense of unlawful

importation).[4]

_____

[4] To convict Mr. Manghis of counts two through eight, the Court did not necessarily have to find that he
personally was involved with importing wildlife products into the United States.  Instead, it could also have
convicted him if he received, concealed, bought, sold, or facilitated the transportation, concealment, or sale of
imported wildlife products, as long as he also knew that the merchandise had been imported illegally.  See 18 U.S.C.
§ 545.  Although this theory of the case is alleged in the indictment, it was not the focus of the government's
presentation at trial.
This alternative theory for convicting Mr. Manghis is relevant to the Court's decision to acquit Mr.
Manghis of count eight.  Count eight stems from the large cache of sperm whale teeth that federal agents seized from

As trial began, the Court recognized that the third element listed above -- that Mr. Manghis knew his acts of importation were contrary to law -- raised issues of interpretation. 18 U.S.C. § 545, the statute under which Mr. Manghis was charged, makes it a crime to "knowingly import[] or bring[] into the United States, any merchandise contrary to law." On its face, the statute is ambiguous as to whether the word "knowingly" merely modifies the verb "import" or the entire phrase "import[] . . . into the United States, any merchandise contrary to law." This problem of how far a *mens rea* term travels down a statutory sentence is a familiar one in criminal law. See Liparota v. United States, 471 U.S. 419, 424, n.7 (1985).

The ambiguous statutory language did not, however, give rise to a dispute at trial. Both parties agreed with the following statement from the commentary accompanying the Fifth Circuit's pattern jury instruction for the offense of illegal importation: "With respect to the knowledge element, it is not necessary for the defendant to have known the specific statute

---

Mr. Manghis' home on June 30, 2005. The government presented ample evidence that at least some of these teeth had been imported from Russia. The Court also finds that at least one of the seized teeth had been purchased by Mr. Manghis from Andriy Mikhalyov, his codefendant. This tooth, which was introduced at trial as Government's Exhibit 27B, bears a distinctive image -- a blue-tinged engraving of a swordfish impaling a shark. The tooth was displayed for sale on Mr. Mikhalyov's website, "sailorsmemento.com," was observed by Special Agent Andrey Guidera during a search of Mr. Manghis' home on February 10, 2005, and was ultimately seized in June 2005. Mr. Manghis' statement on the witness stand that Government's Exhibit 27B is not the same as the tooth displayed for sale on the "sailorsmemento" website is utterly incredible. Even if the image of a swordfish impaling a shark is a common motif in Russian scrimshaw, as Mr. Manghis claims, Government's Exhibit 27B appears identical to the tooth displayed on the right-hand side of the screen shot appearing on slide 207 of Government's Exhibit 16. Mr. Manghis' denial of this obvious fact casts considerable doubt on the credibility of his testimony.

As explained later in this opinion, the Court finds that Mr. Manghis failed to properly declare the sperm whale teeth he purchased from Mr. Mikhalyov and thus knowingly imported them contrary to law. This finding extends to Government's Exhibit 27B. The Court also finds that Mr. Manghis lied to federal agents on June 30, 2005, by telling them that he had no Russian-origin teeth in his home when in fact he knew that he had several such teeth, including Government's Exhibit 27B. Based on these findings, the Court could likely have convicted Mr. Manghis of "knowingly . . . conceal[ing] . . . merchandise after importation, knowing the same to have been imported . . . contrary to law." 18 U.S.C. § 545.

The Court refrained from doing so because this theory had not been the focus of the government's case. In fact, the theory was most clearly articulated in the *defense's* closing argument, and when the Court discussed with counsel the jury instructions that would apply to the case if it were not tried as a bench trial, the government failed to discuss this legal theory. Finally, since the Court could not identify when the teeth included in count eight were shipped into the United States, it was concerned that the teeth may already have been covered by other counts in the indictment (especially counts two and three, which relate to Mr. Manghis' transactions with Mr. Mikhalyov). Thus, to avoid a potentially unfair case of double counting, the Court decided to acquit Mr. Manghis of count eight.

violated.  It is enough if he acts knowing that his conduct is illegal in some respect."  <u>Fifth</u>

<u>Circuit Criminal Jury Instructions</u> § 2.31 (2001); <u>accord</u> <u>United States v. Asper</u>, No. 98cr954,

2000 WL 821714, at *1-*6 (N.D. Ill. June 23, 2000).  Thus, to convict Mr. Manghis of violating

counts two through eight, the Court had to find that Mr. Manghis *knew that his conduct was*

*illegal in some respect*, but the Court did not need to find that he knew of the particular statute or

regulation at issue.

    In his Motion for New Trial or Acquittal, however, the defendant argues that the Court

imposed the wrong standard.  The Court should have imposed a more particular mens rea

requirement: that Mr. Manghis had to know *that the lawful importation of pre-Convention whale*

*teeth required proper documentation*.  There is a general prohibition on the importation of

banned species under CITES.  <u>See</u> 50 C.F.R. § 23.13.  And there are exceptions to this general

rule, including "pre-Convention" specimens, or those acquired before the date the species was

first listed under CITES, and antique specimens more than 100 years old.  The former may be

imported if an application form is filed and the exporting country issues a CITES document

stating that it is pre-Convention.  <u>See</u> 50 C.F.R. § 23.45.  The latter may be imported if an

application documenting that the specimen is actually antique is presented upon importation.  16

U.S.C. § 1539(h).  Mr. Manghis claims -- and the government produced no evidence to the

contrary -- that the whale teeth that he bought were either pre-Convention or antique.  Therefore,

he argues, he need only show that he was ignorant of the particular documentary requirements

for importing lawful specimens, and not that he did not know that importation was generally

banned.

    For this interpretation, Mr. Manghis cites <u>United States v. Pulungan</u>, 569 F.3d 326 (7th

Cir. 2009).  In <u>Pulungan</u>, the Seventh Circuit found that a defendant lacked the mental state to

attempt to willfully export defense guns without a license because he misunderstood the law. While he knew that his activity was illegal, he mistakenly believed that he was prohibited from exporting military articles to Indonesia generally, not that he simply needed a license. The court found that a violation of 22 U.S.C.A. § 2778(c) required knowledge of *the particular law* in addition to the intent to violate the law. Because the defendant did not know the particular rule that he was charged with violating, he could not have been found to "willfully" violate the provision. Id. at 331. Indeed, in some respects, the smuggling statute, 18 U.S.C. § 545, is similar.[5] For Mr. Manghis to know that the importation was contrary to the law, he must have known something about the law. The question is the extent of the knowledge required.

The Asper case, upon which the Court based the jury instruction, wrestled with the particular question of how specific a defendant's knowledge must be to know that he was smuggling remnants of endangered species under CITES. In that case, the government contended that a similar argument put forth by the defense implied that "the government must show that individuals charged with violating the second paragraph of § 545 [the paragraph with which Manghis is charged] were carrying the violated regulations on their person in order to sustain a conviction." Asper, 2000 WL 821714, at *2. The government argued that such a reading would create an impossible burden on the government to prove the importer's actual knowledge of the statutes violated.

---

[5] The Supreme Court has held that the extent of knowledge of the law required to establish mens rea depends on the statute and the type of offense charged. See generally United States v. Balint, 258 U.S. 250 (1922). As a general rule, ignorance of the law is not a defense to criminal prosecution. Cheek v. United States, 498 U.S. 192, 199 (1991) (stating that this rule "is deeply rooted in the American legal system"). In some cases, however, Congress has added knowledge of the law as a requirement. In the case of criminal tax evasion, for example, Congress has added the term "willfully" to the crime. To be criminally liable for tax evasion, a defendant must "willfully" violate the law. The government must prove I) that the law imposed a duty on the defendant; ii) that the defendant knew of this duty, and iii) that he voluntarily and intentionally violated that duty. Id. at 201.

Indeed, such a construction would render the smuggling statute impossible to enforce. The Court agreed and chose to adopt the Fifth Circuit's Pattern Jury Instructions standard that the defendant must "act knowing that his conduct is illegal in some respect." Asper, 2000 WL 821714, at *2 (citing Fifth Circuit Criminal Jury Instructions § 2.31, Note).  Significantly, in the Manghis trial, the Court -- and both parties -- agreed with this reasoning and determined that to be found guilty of smuggling, Mr. Manghis need only know that his conduct was somehow contrary to law, not that he know of the provision.

It is true that the Pulungan court would have required that Mr. Manghis know the provision of the law to be found guilty.  But even the Pulungan holding is more limited than Mr. Manghis suggests.  In that case, the defendant was entirely ignorant about laws relating to unlicensed exports.  569 F.3d at 331.  The court did not hold that a defendant is required to know chapter and verse of the law -- just that where a defendant knows *nothing* about the law with which he is charged of violating, he cannot be held accountable for violating it "willfully." Unlike Pulungan, this is certainly not a case where the defendant had never heard of CITES.

In any case, as I will explain, I find that Mr. Manghis has the requisite mens rea even under the standard that he suggests.  I find that Mr. Manghis knew *that the lawful importation of pre-Convention whale teeth required proper documentation.*

C.      **False Statements**

Finally, to convict Mr. Manghis of the false-statement counts, the Court had to find:

> **First,** that Mr. Manghis knowingly and willfully made a material
> false statement;

> **Second,** that Mr. Manghis made the statement voluntarily and
> intentionally; and

-10-

**Third,** that Mr. Manghis made the statement in a matter within the jurisdiction of the executive, legislative, or judicial branch of the U.S. government.

See Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.1001

(2009); see also 18 U.S.C. § 1001.

## III.    THE CONSPIRACY AND UNLAWFUL IMPORTATION COUNTS

### A.    Mr. Manghis Imported the Items Listed in Counts Two Through Seven of the Indictment Without Declaring Them to Federal Officials.

The law requires that importers declare all wildlife and wildlife parts that are shipped into

the United States and obtain clearance from U.S. officials.  50 C.F.R. § 14.52(a) ("Except as

otherwise provided by this subpart, [an officer of the U.S. Fish and Wildlife Service] must clear

all wildlife imported into the United States prior to release from detention by Customs

officers."); 50 C.F.R. § 14.52(b) ("An importer/exporter must return forthwith any wildlife

released without a [U.S. Fish and Wildlife Service] officer's clearance . . . to a port where

clearance may be obtained . . . ."); 50 C.F.R. § 14.61 ("[I]mporters . . . must file with the [U.S.

Fish and Wildlife Service] a completed Declaration for Importation or Exportation of Fish or

Wildlife (Form 3-177)[.]").[6]  At trial, the defendant strenuously argued that these declaration and

---

[6] The indictment also refers to 19 C.F.R. § 148.11, which provides:

All articles brought into the United States by any individual must be declared to a [Customs and Border Protection] officer at the port of first arrival in the United States, on a conveyance en route to the United States on which a CBP officer is assigned for that purpose, or at a preclearance office in a foreign country where a United States CBP officer is stationed for that purpose.

On its face, section 148.11 appears to apply to Mr. Manghis' importation of whale and elephant ivory from foreign countries.  After all, those pieces of merchandise must have been brought into the United States by someone, and section 148.11 requires any individual bringing items into the United States to declare them.  However, this regulation appears in Code of Federal Regulations Title 19, Part 148, which governs "Personal Declarations and Exemptions."  Thus, it seems that section 148.11 was primarily intended to apply to individuals entering the United States with their own baggage and personal effects, not to merchandise being transported into the United States by commercial shipping companies.  See 19 C.F.R. § 148.0.  It would seem that the regulations contained in Title 19, Parts 141, 142, and 145, which govern the entry of merchandise and importations via mail, more clearly apply to Mr. Manghis' purchases of ivory from foreign sources.

clearance requirements did not apply to his shipments of whale and elephant ivory, a position he

now abandons.  Now he argues that he *did not know* documentation was required.  Def.'s Mem.

Supp. Mot. New Trial or Acquittal  at 17 (document #132).  Defendant's trial argument -- that no

documentation was required -- was clearly absurd.  Defendant claimed that 50 C.F.R. § 14.61

requires importers to file a declaration form "at the place where Service clearance under [50

C.F.R. § 14.52] is requested."[7]  Section 14.52(a), in turn, requires an officer of the U.S. Fish and

Wildlife Service "to clear all wildlife imported into the United States prior to release from

detention by Customs officers."  And 50 C.F.R. § 14.51 states that officers of the U.S. Fish and

Wildlife Service and Customs and Border Protection "may," but not must, detain and inspect any

imported package, crate, or other container.  Thus, the defendant argued, section 14.61's

declaration requirement applies only to those packages that federal officials choose to detain and

inspect.  Since Mr. Manghis' packages were not specially selected for detention and inspection,

he claimed that he was not obliged to make any declaration under section 14.61.

    Mr. Manghis could not cite any case law that supports his convoluted reading of the U.S.

Fish and Wildlife Service's regulations.  In fact, courts have explicitly stated that section 14.61

"requires persons importing wildlife into the United States to complete, sign, and file a [Fish and

---

        To be clear, the Court is not holding that section 148.11 did not apply to the transactions alleged in the
indictment.  Instead, the Court simply notes that it is uncertain about section 148.11's application to this case.  The
Court could certainly order additional briefing on this issue, but it sees no reason to do so.  Mr. Manghis was clearly
required to declare the wildlife that he had shipped to him under 50 C.F.R. § 14.61.  The absence of any records of
such declarations in the U.S. Fish and Wildlife Service's electronic database and Mr. Manghis' admission to federal
agents that he had not declared items that he had located on the internet auction site eBay show that Mr. Manghis did
not abide by this declaration requirement.  Thus, the Court concludes that Mr. Manghis violated 50 C.F.R. § 14.61 in
carrying out the importations referred to in counts one through seven.  Since the Court has held that Mr. Manghis did
not abide by section 14.61, it need not reach the question of whether he also violated section 148.11.

        [7] Under 50 C.F.R. § 14.61, importers of certain antique items specified in 50 C.F.R. § 14.22 must file a
declaration form "with the District Director of Customs at the port of entry prior to release from Customs custody,"
not with the U.S. Fish and Wildlife Service.  Section 14.22, however, explicitly states that it does not apply to
scrimshaw, at least when the art is practiced on whale bones or teeth.  Furthermore, to the extent that section 14.22
arguably applies to any of the ivory that Mr. Manghis imported, the evidence shows that Mr. Manghis did not file
any declaration forms, either with Customs and Border Protection or the U.S. Fish and Wildlife Service.

Wildlife Service] Form 3-177 upon entry at a designated port." United States v. Mitchell, 39

F.3d 465, 470 (4th Cir. 1994); see also United States v. Santillan, 243 F.3d 1125, 1128 (9th Cir.

2001) (noting that section 14.61 "requires that wildlife importers file a 'Declaration for

Importation or Exportation of Fish or Wildlife'"); United States v. Manneh, 645 F. Supp. 2d 98,

103 (E.D.N.Y. 2008); Asper, 2000 WL 821714, at *8; Florsheim Shoe Co. v. United States, 880

F. Supp. 848, 852 (Ct. Int'l Trade 1995).

In any case, the defendant's argument makes little sense under the plain language of the

regulations. Section 14.52(b) mandates that importers obtain clearance of any wildlife or

wildlife products that they bring into the United States. Any wildlife that is not cleared must be

returned "forthwith" to a port where clearance can be obtained. 50 C.F.R. § 14.52(b).[8] Thus,

section 14.61's statement that a declaration form must be filed "at the place where Service

clearance . . . is requested" does not limit the regulation's declaration requirement to those cases

in which federal officials have detained a package and subjected it to special scrutiny. Instead,

this statement merely specifies where importers must file their declaration forms, which must

accompany almost all international shipments of wildlife products to the United States.[9]

Moreover, this reading of section 14.61 is consistent with CITES and the Endangered Species

Act, which impose their own declaration requirements on importers and exporters of wildlife

products.[10]

---

[8] Although "antique articles," as that term is defined in 50 C.F.R. § 14.22, are exempted from this clearance requirement, 50 C.F.R. § 14.61 still requires an importer of antiques to file a Form 3-177. Therefore, even if some of the items imported by Mr. Manghis qualified as "antique articles" under section 14.22, they were still subject to section 14.61's declaration requirement.

[9] 50 C.F.R. § 14.62 provides for a limited number of exceptions to section 14.61's declaration requirement. However, these exceptions are not relevant to the case at bar.

[10] Mr. Manghis made much of the fact that CITES and the Endangered Species Act loosen their trade restrictions for the parts of animals whose species were not governed by the treaty or act at the time they were removed from the wild. For example, CITES provides that when the country from which a specimen is exported is

Mr. Manghis principally tries to take advantage of the Endangered Species Act's exemption for antique articles that are at least 100 years of age.  See 16 U.S.C. § 1539(h).  He argues that the scrimshaw he used did not fit under the Act.  However, even assuming that was so, he was still required by law to submit documentation to prove that the items qualified for this exemption.  See 16 U.S.C. § 1539(h)(2); see also 16 U.S.C. § 1539(g) (placing the burden of proving an exemption to the Endangered Species Act's trade restrictions on the person claiming the exemption); 50 C.F.R. § 14.61 (requiring importers of even antique articles to file declarations).

Thus, Mr. Manghis' contention at trial that he should be acquitted of counts one through seven because the government could not prove the exact age of the wildlife parts that he imported is meritless.  Regardless of the specimens' ages, Mr. Manghis was required to declare the items when he imported them into the United States.  Since Mr. Manghis did not make the necessary declarations, he violated the law.

## B.   Mr. Manghis Knowingly Effected the Illegal Importations Alleged in Counts Two Through Seven of the Indictment.

---

satisfied that the specimen was acquired before CITES applied to the specimen, then the exporting country can issue a certificate to that effect, thus releasing the specimen from CITES' trade restrictions.  CITES, supra, art. VII(2).  However, Mr. Manghis never obtained such an export certificate, so he cannot benefit from this provision of CITES.  See 50 C.F.R. § 23.20 (requiring an individual engaging in the international trade of pre-CITES specimens to have a "CITES document indicating pre-Convention status").

The Court cites to the current version of the Code of Federal Regulations, which is also the version on which the defense relies in making its arguments.  As the government notes, the United States' regulations that implement CITES were substantially rewritten in 2007.  See Revision of Regulations Implementing the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), 72 Fed. Reg. 48402-1 (Aug. 23, 2007).  Since the defendant's offenses all predate 2007, older versions of the United States' CITES regulations technically apply to Mr. Manghis' conduct.  However, since the defense seems content to cite modern regulations and the Court cannot discern any material difference between the current regulations and their predecessors, the Court will continue to cite the regulations that are currently in force.  See United States v. Vazquez-Rivera, 135 F.3d 172, 177 (1st Cir. 1998) (noting that the Constitution's Ex Post Facto Clause is triggered only if application of an amended law would disadvantage the offender).  Compare 50 C.F.R. § 23.20, with 50 C.F.R. § 23.13(c) (2005) (providing an exception to the United States' prohibition of the importation of wildlife to which CITES applies in cases where "a certificate has been issued by the . . . country of origin or the country of re-export to the effect that the wildlife . . . was acquired prior to the date the Convention applied to it").

To convict Mr. Manghis of counts two through seven, the Court must find that he either personally imported or aided and abetted the importation of the items listed in the indictment. See 18 U.S.C. § 2.  At trial Mr. Manghis urged the Court to apply the definition of the term "import" provided in 16 U.S.C. § 1532(10), which states:

> The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

See Def.'s Mot. to Dismiss Re Obligations of an Importer at 2 (document #27).

Under this definition, Mr. Manghis undoubtedly imported the wildlife products listed in counts four through seven.  Mr. Manghis located the sellers of these items through the online auction site eBay and arranged to have the items shipped directly to him in the United States.

Counts two and three are more complicated, but only slightly so.  The sperm whale teeth identified in these counts were not sent directly to Mr. Manghis.  Instead, Andriy Mikhalyov delivered these teeth to Mr. Manghis through a middleman in California named James Saunders ("Mr. Saunders").  Mr. Manghis also paid for the teeth through Mr. Saunders instead of making direct payments to Mr. Mikhalyov.  In a different case, Mr. Saunders' involvement in the transactions might have led the Court to question whether Mr. Manghis can be held liable for any violations of import regulations that might have occurred.  Based on the facts presented at trial, however, the Court finds beyond a reasonable doubt that Mr. Manghis was the true importer of the teeth listed in counts two and three.  As discussed in further detail below, Mr. Manghis negotiated his purchases of sperm whale teeth directly with Mr. Mikhalyov.  When there were problems with shipping or with the quality of the merchandise he purchased, Mr. Manghis contacted Mr. Mikhalyov.  Mr. Saunders was merely a conduit for the exchange of

money and packages.  He was not the traditional importer who purchases foreign goods, brings

them into the United States, and then resells them to domestic buyers.

Furthermore, even if Mr. Saunders was the true importer of the items listed in counts two

and three of the indictment, such a finding would hardly bar a conviction.  Mr. Manghis clearly

aided and abetted Mr. Saunders' efforts to bring foreign sperm whale teeth into the United States.

Under standard principles of accomplice liability, Mr. Manghis can therefore be held responsible

for Mr. Saunders' crimes as if he committed them himself.  <u>See</u> 18 U.S.C. § 2.  In addition, the

Court finds that Mr. Manghis conspired with Mr. Saunders to knowingly import sperm whale

teeth contrary to law.  As a result, Mr. Manghis can be held liable for Mr. Saunders' violations of

18 U.S.C. § 545 since Mr. Saunders' criminal conduct was reasonably foreseeable and was

committed in furtherance of the conspiracy.  <u>See</u> <u>Pinkerton v. United States</u>, 328 U.S. 640, 645-

48 (1946).

> **C.      Mr. Manghis Willfully Entered into an Agreement with James Saunders and Andriy Mikhalyov to Import Sperm Whale Teeth Contrary to Law and That Mr. Manghis and His Co-conspirators Committed Several Overt Acts in Furtherance of Their Conspiracy.**

As stated above, the Court has found that Mr. Manghis conspired with James Saunders

and Andriy Mikhalyov to import sperm whale teeth in a manner that violated U.S. law.  For the

sake of completeness, the Court here explicitly articulates the factual findings that underlie this

conclusion.  From the emails that the government extracted from Mr. Manghis' computer, <u>see</u>

Gov't Trial Ex. 16, it is clear that Mr. Manghis, Mr. Saunders, and Mr. Mikhalyov agreed to

import sperm whale teeth into the United States.  It is also clear that Mr. Manghis willfully

joined this agreement.  Furthermore, the Court finds that the conspirators never intended to

declare their importations to federal officials, as required by U.S. law.  Finally, the Court finds

that the conspirators committed several overt acts in furtherance of their conspiracy, including

the shipments of the sperm whale teeth referred to in counts two and three of the indictment.

### D.      Mr. Manghis Knew That His Conduct Was Unlawful.

The Court has found that Mr. Manghis and his co-conspirators knowingly imported ivory products from foreign countries.  The Court has also found that these importations violated U.S. law because they were not accompanied by the requisite declarations.  The Court, however, cannot end its analysis with these findings.  As discussed above, it is not enough to find that (1) Mr. Manghis knowingly imported (or agreed to import) ivory products, and (2) these importations violated U.S. law.  The Court must also find that Mr. Manghis had the requisite *knowledge* of the law.

Again, the defendant urges me to reconsider the standard of knowledge that I imposed at trial, and to which his then counsel agreed.  I found that Mr. Manghis had to know that his conduct was in some way illegal.  The defendant now suggests that I decide instead that the government had to prove that Mr. Manghis knew *that the lawful importation of pre-Convention whale teeth required proper documentation*.  Mr. Manghis has continually asserted that he knew that it was generally illegal to import sperm whale teeth, but that the ban did not apply to antiques or pre-Convention items.  The evidence suggests that this account of his knowledge is highly implausible.  I find that Mr. Manghis had the requisite knowledge of the illegality of his conduct under either standard.[11]

---

[11] In deciding whether Mr. Manghis knew that his importations of ivory products violated the law, the Court may consider evidence the he consciously and deliberately avoided learning facts that would make the illegality of his conduct apparent.  Courts often refer to this state of deliberate ignorance as "willful blindness."  In the words of the First Circuit's pattern jury instruction on the matter:

> In deciding whether [a defendant] acted knowingly, [the fact finder] may infer
> that [the defendant] had knowledge of a fact if [the fact finder] find[s] that
> [he/she] deliberately closed [his/her] eyes to a fact that otherwise would have
> been obvious to [him/her].  In order to infer knowledge, [the fact finder] must
> find that two things have been established.  First, that [the defendant] was aware
> of a high probability of [the fact in question].  Second, that [the defendant]

The Court's finding that Mr. Manghis knew that his conduct was unlawful is based on a large amount of compelling circumstantial evidence.  To be sure, there was no smoking gun.  The government could not produce an email in which Mr. Manghis stated anything to a foreign seller that could have been construed as knowledge that his actions were unlawful.  While such an email obviously would have been helpful to the government, it was surely not required for the government to prove its case.  The inference that Mr. Manghis knew that his conduct was illegal easily follows from the evidence adduced at trial, which the Court will now review in detail.

---

consciously and deliberately avoided learning of that fact.  That is to say, [the defendant] willfully made [himself/herself] blind to that fact.  It is entirely up to [the fact finder] to determine whether [he/she] deliberately closed [his/her] eyes to the fact and, if so, what inference, if any, should be drawn.  However, it is important to bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient.  There must be a deliberate effort to remain ignorant of the fact.

Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 2.16 (2009).  Had this case been tried to a jury, the Court would have considered giving a willful blindness instruction because Mr. Manghis claimed to lack knowledge of the illegality of his conduct and the evidence, which the Court reviews in detail below, supported an inference that he consciously avoided information that would clearly demonstrate that the manner in which he was importing foreign ivory violated U.S. law.  See United States v. Gabriele, 63 F.3d 61, 66 (1st Cir. 1995) ("A willful blindness instruction is warranted if (1) the defendant claims lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; and (3) the proposed instruction, as a whole, could not lead the jury to conclude that an inference of knowledge was mandatory.").

To be sure, the doctrine of "willful blindness" is troubling because it has been used by some courts to conflate the distinct mental states of "knowledge" and "recklessness."  See, e.g., United States v. Ramsey, 785 F.2d 184, 189 (7th Cir. 1986) (equating "criminal recklessness" with "knowledge"); see also Model Penal Code § 2.02(2)(c) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.").

At the same time, it is true that a defendant's failure to take simple steps to confirm or deny the existence of a fact may serve as circumstantial evidence that the defendant already knew the fact and thus considered further inquiry to be unnecessary.  See Ramsey, 785 F.2d at 189 (offering, as one justification for the giving of willful blindness instructions, the rationale that " [i]f a person with a lurking suspicion goes on as before and avoids further knowledge, this may support an inference that he has deduced the truth and is simply trying to avoid giving the appearance (and incurring the consequences) of knowledge").

In reaching its verdict, the Court did not use a "willful blindness" rationale, but rather considered willful blindness as circumstantial evidence of knowing.  The Court considered evidence that Mr. Manghis failed to seek out further information regarding the legal requirements applicable to the importation of ivory products only to the extent that such evidence tended to show that Mr. Manghis was well aware that he would not like what his inquiry would reveal because he generally *knew* his conduct was illegal.

The Court begins with the defendant's view of the facts.  By doing so, the Court does not in any way intend to suggest that the defendant bore the burden of proving that he did not know of the illegality of his conduct.  The burden of proving the defendant's knowledge was clearly on the government.  Nevertheless, the relevance of some of the evidence presented by the government is best understood in light of the defense's theory of the case.

Mr. Manghis testified at trial that at the time of the importations discussed in the indictment, he believed that the importation of antique articles at least 100 years old was not subject to any declaration requirements or other restrictions.  According to Mr. Manghis, his belief was based principally on a presentation made by Special Agent Gino Moro of the National Marine Fisheries Service at a scrimshaw conference in the late 1980s.  Mr. Manghis claims that in his presentation, Agent Moro told the audience that antique items were not subject to any import regulations.  However, a journalistic account of the conference introduced by the defense tells a different story.  It states:

> [Agent Moro's presentation] proved to be a disappointment to many present, as it failed to substantially clarify the issue of the legality of dealing in scrimshaw.  Mr Moro stated that it was not the intention of the endangered Species Act of 1973 to eliminate antique trade, but rather to eliminate the importation of endangered species.  Exceptions include Alaskan exemptions (i.e. animals taken for subsistence purposes), and for making handicraft items, and for antique items (anything over 100 years), *burden of proof being on the possessor*.

Nina Hellman, First Scrimshaw Conference Addresses Collectors Concerns, Antiques & the Arts Weekly, Apr. 7, 1989, at 54 (Def.'s Trial Ex. 8) (emphasis added).  Thus, the article indicates that even the importer of an antique article must do something (although the article does not specify what) to prove that the imported item is at least 100 years old.  Mr. Manghis admits that

he read this article.  He also admitted in an interview with Special Agent Andrey Guidera that after the conference he received some "conflicting information" about the laws applicable to the importation of antique wildlife products.  Nevertheless, he admits that he did not take any steps, including the simple step of contacting the U.S. Fish and Wildlife Service, to try to clarify the laws governing his importation of foreign ivory.

Mr. Manghis' claim that he believed that he could import antique items without making any declarations could possibly explain his failure to declare the items he purchased from eBay sellers.  Most of these items were marketed by their sellers as antiques.  Mr. Manghis, however, cannot plausibly assert that he believed that all of the sperm whale teeth that he purchased from Mr. Mikhalyov were at least 100 years old.  Some of these teeth are engraved with dates that reach well into the twentieth century, and at least one tooth is engraved with an image of Joseph Stalin, which suggests that the tooth significantly post-dated the Russian Revolution of 1917.  These facts would seem to belie any claim that Mr. Manghis believed the teeth he purchased from Mr. Mikhalyov to be at least 100 years old.

Mr. Manghis, however, patches this hole in his theory of the case by claiming that he was not relying on a supposed antiques exception when he made his purchases from Mr. Mikhalyov.  Instead, Mr. Manghis argues, he relied on James Saunders, the middleman in the transactions, to comply with any regulatory requirements necessary to import the teeth.  If any laws were violated in carrying out these transactions, Mr. Manghis contends that the blame should fall on Mr. Saunders, not on him.

This defense, however, fails in light of the evidence that the government presented at trial.  Despite his claims to the contrary, Mr. Manghis was not the innocent purchaser of goods

that, without his knowledge, had been illegally imported into the United States.  Mr. Manghis was well apprised of Mr. Mikhalyov's efforts to ship large quantities of sperm whale teeth to the United States and actively encouraged his endeavors.  Admittedly, an archived page of Mr. Mikhalyov's "sailors memento" website states that the merchandise sold on the site is shipped through the United States Postal Service from California.  However, any illusions that Mr. Manghis might have had that he was placing an order for sperm whale teeth from a seller in California were quickly dispelled.

On July 3, 2002, Mr. Manghis ordered sperm whale teeth from Mr. Mikhalyov, to whom he referred as "Andy," via email.  Gov't Trial Ex. 16, at 8.  When his order did not arrive on time, Mr. Manghis sent Mr. Mikhalyov another email inquiring where his packages were.  Id. at 17.  Mr. Mikhalyov responded by noting that "customs inspections have recently been increased and many more packages are to be opened because of the terrorist activities.  This will delay deliverys [sic]."  Id. at 20.  This July 16, 2002, email from Mr. Mikhalyov made it clear (even assuming that it was not clear before) that Mr. Manghis' order was being filled by a foreign distributor, not a seller in California.

But even if Mr. Manghis somehow failed to note this red flag, the evidence that he was buying from a foreign seller who was not abiding by United States and foreign trade regulations continued to mount.  On July 17, 2002, Mr. Mikhalyov sent Mr. Manghis an email stating:

> I learned today that the new team at the local customs in Odessa imposed new rules and this problem is created by them.  They returned 4 packages to John today (my competition here) and his [text of email unreadable] signed a paper stating that he will not send these souvenirs anymore because they are valuable according to some new museum paper.

> I am relieved to some degree because the local problem here is probably possible for me to solve.  They did not return anything to me yet but I found out that they keep 100 packages from the Odessa post office and I was told someone can help.

Id. at 23.  The next day Mr. Mikhalyov sent Mr. Manghis another email implying that "clerks" -- presumably referring to employees of the Ukrainian government -- were demanding bribes and that officials would only permit teeth with artwork on them to be shipped.  Mr. Mikhalyov concludes the email by stating that he would have to "find a full-time artist," presumably to engrave artwork on his stock of teeth so that their exportation would be approved by the Ukrainian government.  Mr. Manghis responded to Mr. Mikhalyov's email by wishing him "good luck" with his endeavors and telling Mr. Mikhalyov that he would "have to become an artist."  Id. at 25.

Mr. Mikhalyov sent Mr. Manghis another email on July 19, 2002, to let him know that he had "found the key" to solving the problems he had encountered in delivering the order of sperm whale teeth to Mr. Manghis.  Mr. Mikhalyov also told Mr. Manghis that he would be able to ship more teeth in the future but not in such great quantities because the number of packages he had been sending had attracted "extra attention," presumably from government officials.  Id. at 28. Mr. Manghis again responded by wishing Mr. Mikhalyov good luck in his efforts.  Id.

On July 26, 2002, Mr. Manghis received another email in which Mr. Mikhalyov complained of his shipments being held up by "a group of people from Odessa rail terminal who secretly collected and held them there perhaps thinking the more they collect the larger bribe they get."  Id. at 34.  Mr. Manghis finally received his packages in August 2002.  Id. at 37-40.

From this chain of email correspondences, the Court finds that Mr. Manghis knew that the items he purchased from Mr. Mikhalyov were not coming from California but were instead

being shipped from Odessa, Ukraine.  Despite his knowledge that he was dealing with a foreign seller, Mr. Manghis did not stop making purchases from Mr. Mikhalyov.  On the contrary, he placed additional orders in July and August 2003.  Id. at 70-110.  These orders are the foundation for counts two and three of the indictment.

In short, although Mr. Manghis asserts that he really made his purchases from Mr. Saunders, not from Mr. Mikhalyov, this claim is at odds with the facts.  Mr. Manghis did not place his orders with Mr. Saunders.  Instead, he contacted Mr. Mikhalyov directly.  See id. at 8 (Mr. Manghis tells Mr. Mikhalyov "we have a deal"), 72-73 (Mr. Manghis offers to purchase the teeth discussed in count two of the indictment from Mr. Mikhalyov), 97 (in an email addressed to "Andy," Mr. Manghis offers to purchase the teeth included in count three).  When Mr. Manghis had issues with the quality of the merchandise he received, he addressed his concerns to Mr. Mikhalyov, not to Mr. Saunders.  See id. at 83-85.  Mr. Saunders was a mere conduit for the exchange of money and packages between Mr. Manghis and Mr. Mikhalyov.  He was not, by any stretch of the imagination, the true source or seller of the teeth that Mr. Manghis purchased.

Although Mr. Manghis' last documented purchase from Mr. Mikhalyov occurred in August 2003, he continued to pursue other foreign sources of ivory.  On or about August 31, 2003, Mr. Manghis purchased a set of ivory billiard balls, which are described as elephant ivory in count four of the indictment, from an eBay seller located in the United Kingdom.  See Def.'s Admis. of Fact ¶ 5 (document #89); see also Gov't Trial Ex. 16, at 112-13; Gov't Trial Ex. 35.  On approximately December 5, 2003, Mr. Manghis purchased the sperm whale tooth and tusk thermometer referred to in count five from another eBay seller located in the U.K.  See Def.'s Admis. of Fact ¶ 6; see also Gov't Trial Ex. 4.  Mr. Manghis then bought the sperm whale tooth

mentioned in count six of the indictment from a U.K.-based eBay seller on approximately February 17, 2004.  <u>See</u> Def.'s Admis. of Fact ¶ 7; <u>see also</u> Gov't Trial Ex. 5; Gov't Trial Ex. 16, at 114-16.  Finally, Mr. Manghis purchased the sperm whale teeth referred to in count seven of the indictment in June 2004 from Jan Kay, another seller located in the U.K.  <u>See</u> Def.'s Admis. of Fact ¶ 8; <u>see also</u> Gov't Trial Ex. 16, at 122-93.

When Mr. Manghis imported the items that he purchased from foreign sellers, he did not declare that the shipments contained wildlife products as required by 50 C.F.R. § 14.61.  Thus, regardless of the specimens' ages, the manner in which he carried out the importations violated federal law.  But beyond that, there are many indications that Mr. Manghis knew, more namely, that his purchases from foreign sellers were governed by statutes and regulations that he made no pretense of following.

In particular, the Court bases its finding that Mr. Manghis knew that his conduct was unlawful on the following evidence presented at trial:

- Mr. Manghis attended Agent Moro's presentation at the 1989 scrimshaw conference.  Furthermore, Mr. Manghis read a journalistic account of Agent Moro's presentation that emphasized that Mr. Moro said that individuals wishing to rely on the antiques exception of the Endangered Species Act bore the burden of proving that their items were at least 100 years old.  <u>See</u> Def.'s Trial Ex. 8.

- Mr. Manghis knew that eBay had rules restricting the sale of ivory products on its website.  On November 2, 2001, Mr. Manghis received an email from U.K.-based eBay seller Julie Matthews stating that an item in which Mr. Manghis had expressed interest had been removed from eBay "because of regulations about selling animal parts on to [eBay's] users."  Def.'s Trial Ex. 7.  Despite this message, Mr. Manghis continued to try to arrange a deal with Ms. Matthews.  Similarly, Mr. Manghis received an email from Jan Kay stating that the eBay auction in which Mr. Manghis had placed a bid had been cancelled because "it was against the rules."  Gov't Trial Ex. 16, at 125.  Mr. Manghis responded that Ms. Kay's listing was not "really . . . against the rules as the teeth were clearly antique."  <u>Id.</u>  He also criticized eBay's rules as neither "equitable or smart."  <u>Id.</u>

He pursued and ultimately consummated a deal with Ms. Kay, and this transaction is the foundation for count seven of the indictment.

• Mr. Manghis authored and reviewed documents that explicitly stated that the United States prohibits the importation of sperm whale ivory. An October 2002 article in the magazine *Cape Cod Life* that profiled Mr. Manghis contained the following line: "Now, as the import of whale ivory is banned in the U.S., the stock of materials is ever more rare and difficult to find, and not a scrap goes to waste." Gov't Trial Ex. 2. Mr. Manghis reviewed this article before it was published. He corrected only one spelling error and did not object to its discussion of the United States' ban on the importation of whale ivory. Gov't Trial Ex. 16, at 212-14. Mr. Manghis then prominently showcased this article on top of a display case in the antiques store where he sold his scrimshaw. Gov't Trial Exs. 3, 3A. Furthermore, in a document dated October 2002 that describes his scrimshawed depiction of the USS Constitution, Mr. Manghis writes, "[L]arge Sperm whale teeth are exceedingly rare since the embargo of all marine mammals went into effect in 1972, and cannot be imported to the US." Gov't Trial Ex. 16, at 208. Similarly, in a December 2002 description of another scrimshawed work, Mr. Manghis states, "All Sperm Whale ivory has been banned from U.S. importation since the Congress passed the endangered Marine Mammal Protection Act of 1972." Id. at 209. Neither the October 2002 document nor the December 2002 document contains any reference to a supposed exception for sperm whale teeth that qualify as "antiques."

• Mr. Manghis appears to have wanted to hide the fact that he purchased ivory that he found on eBay. After Mr. Manghis won the auction for the sperm whale tooth mentioned in count six, he requested that the seller delete the image of the tooth from the eBay server. See id. at 114-16. Mr. Manghis also asked Jan Kay, the seller of the sperm whale teeth referred to in count seven, to keep their email communications "confidential" because he did not "wish to be tossed off ebay." Id. at 134.

• On April 25, 2004, Mr. Mikhalyov sent Mr. Manghis an email stating, "Our port customs does not let the teeth with the museum permission or in small packages now. So unless there is an import permit faxed to me from you I could not mail more." Id. at 61. Similarly, on April 29, 2004, Mr. Mikhalyov[12] told Mr. Manghis via email that he was welcome to place additional orders if he could "get an import permit to comply with the Endangered Species Act and CITES" or could

---

[12] Although the "From" field of both this email and the earlier email dated April 25, 2004, states "'James Saunders' <bixlandisoff@hotmail.com>," the bodies of the emails make it clear that they are from "Andy." Special Agent James Cassin, Jr., also testified that the emails' X-Originating-IP addresses indicate that the emails were sent from Ukraine. Thus, the Court concludes that the emails were sent by Mr. Mikhalyov, who went by the name Andy and was located in Ukraine, and not by Mr. Saunders. However, regardless of who sent the emails, they certainly put Mr. Manghis on notice that special restrictions apply to the importation of sperm whale teeth.

find a "customs broker to guarantee [that] the right paperwork [was completed]." Id. at 65. Although these emails clearly indicate that special legal requirements apply to the importation of sperm whale teeth, the Court recognizes that they post-date all of the shipments discussed in the indictment except for the shipment mentioned in count seven, which occurred sometime in June or July 2004.

•     As described above, Mr. Mikhalyov apprised Mr. Manghis of the difficulties he encountered when attempting to ship sperm whale teeth from Ukraine to the United States.

•     In his February 3, 2005, interview with Agent Guidera, Mr. Manghis admitted that he had received "conflicting information" regarding the laws applicable to the importation of ivory products. Nevertheless, he failed to take any steps to confirm whether the manner in which he was importing whale and elephant ivory complied with the law.

•     When confronted by federal agents about his activities, Mr. Manghis lied by saying that the teeth he purchased from Mr. Mikhalyov actually came from a seller in California and that he had no Russian-origin teeth in his home.

In light of this evidence, Mr. Manghis' testimony that he did not believe that his purchases from foreign sellers were subject to any regulations or that they required written documentation is simply incredible. Mr. Manghis himself stated in documents written in October and December 2002 that the United States generally banned the importation of sperm whale teeth. See id. at 208-09. It is inconceivable that Mr. Manghis could write this yet still at the same time honestly believe that the importation of ivory products that are at least 100 years old would not be subject to even a declaration requirement. Common sense dictates that the general prohibition on the importation of endangered species parts would be a dead letter if individuals could decide for themselves whether their items qualified as antiques rather than being required to subject the articles to independent scrutiny by government officials -- or as the defense suggested if the individuals could file their own "affidavit" stating that the item is an antique according to their own "expertise." The evidence discussed above, especially the

evidence of Mr. Manghis' attempts to hide his transactions from eBay and his lies to federal authorities, demonstrates that this common-sense insight did not escape Mr. Manghis.  The Court finds beyond a reasonable doubt that Mr. Manghis knew that the importation of antique whale teeth or ivory required written documentation and that his conduct was unlawful.  And this finding is sufficient for the Court to convict Mr. Manghis of the crimes charged in counts one through seven.

> **E.      The Defendant Was Not a Mere Purchaser.**

In his Motion for New Trial or Acquittal, the defendant argues that the evidence of conspiracy showed merely a buyer/seller relationship and that therefore the defendant should be acquitted, or that a new trial should be granted on ineffectiveness of defense counsel in not raising this defense.  The key question here is whether the buyer/seller defense, used primarily in narcotics cases, applies to scrimshaw and if so, whether Mr. Manghis was merely a purchaser.

The First Circuit has accepted that a "mere buyer-seller relationship . . . is insufficient to establish a conspiracy."  United States v. Thompson, 449 F.3d 267, 275 (1st Cir. 2006) (citing United States v. Gore, 154 F.3d 34, 40 (1st Cir. 1998)).  To prove conspiracy, the prosecution must prove that the parties share a joint objective to commit the underlying offense.  And where one party is merely a buyer and one party is a seller, the parties have different purposes, one to buy and the other to sell.  Courts have found there to be no joint objective.  See United States v. Manchillas, 580 F.2d 1301, 1307 (7th Cir. 1978).  Courts have allowed the buyer/seller defense to conspiracy even where the buyer knows that the goods are stolen.  See, e.g., United States v. Kapp, 781 F.2d 1008 (3d Cir. 1986) ("[T]he relationship of a buyer and seller, standing alone, without any prior or contemporaneous understanding beyond the mere sales agreement, does not

establish conspiracy to transport stolen goods even though the parties know of the stolen nature

of the goods.")  In this case, the defendant argues, even if Manghis knew that the scrimshaw was

illegally imported, he did not participate in the conspiracy since he was merely a buyer.

The buyer-seller defense, however, has generally been raised exclusively in drug cases.[13]

It arose out of a public policy concern explained at length by the Second Circuit in <u>United States</u>

<u>v. Parker</u>:

> As a literal matter, when a buyer purchases illegal drugs from a
> seller, two persons have agreed to a concerted effort to achieve the
> unlawful transfer of the drugs from the seller to the buyer.
> *According to the customary definition, that would constitute a
> conspiracy with the alleged objective of a transfer of drugs from
> the seller to the buyer.*  Our case law, however, has carved out a
> narrow exception to the general conspiracy rule for such
> transactions. . . .
>
>  . . . *This exception from the customary standards of conspiracy
> preserves important priorities and distinctions of the federal
> narcotics laws, which would otherwise be obliterated.*  The federal
> scheme of prohibition of controlled substances distinguishes
> importantly between, on the one hand, distribution of a controlled
> substance, which is heavily punished, and, on the other, possession
> or acquisition of a controlled substance, which is punished far less
> severely, if at all. . . . Therefore, if an addicted purchaser, who
> acquired drugs for his own use and without intent to distribute it to
> others, were deemed to have joined in a conspiracy with the seller
> for the illegal transfer of the drugs from the seller to himself, the
> purchaser would be guilty for substantially the same crime and
> liable for the same punishment, as the seller.  *The policy to
> distinguish between transfer of an illegal drug and the acquisition
> or possession of the drug would be frustrated.*

554 F.3d 230, 234 (2nd Cir. 2009) (emphasis added).

---

[13] The defense admits that the buyer/seller defense has been applied to a nonnarcotic sale in only one reported case, <u>Kapp</u>, 781 F.2d 1008.

The sale of scrimshaw is not sufficiently similar to transactions that the same policy rationale should create an exception for purchasers.  Unlike the narcotics laws, CITES and the Endangered Species Act do not distinguish between buyer and seller.  Under 16 U.S.C. § 3372(a), it is unlawful for any person to "*import*, *export,* transport, *sell, receive*, acquire or *purchase* any . . . wildlife . . . taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States." (emphasis added).  Any person who violates this provision "knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of or in a manner unlawful under, any underlying law, treaty, or regulation" is guilty of a felony.  16 U.S.C. § 3373.  It is just as wrong, under the law, to sell as to receive, to import as to export.  Under the law, therefore, Mr. Manghis is no less guilty of a conspiracy to knowingly import sperm whale teeth than Mr. Mikhalyov or Mr. Saunders merely because he was the "purchaser."  I decline to extend this defense to the purchase and sale of endangered species.

Even if the defense applied, I have already said that Mr. Manghis was more than a mere purchaser.  In this case, he blatantly encouraged Mr. Mikhalyov to bribe or in general evade trade regulations.  Here again the correspondence between the parties defeats the defendant's argument.  See supra, Part III(D).  In these emails, Mr. Manghis not only turned a blind eye to the attempt to circumvent CITES, but he actually encouraged illegal behavior, stating that Mr. Mikhalyov would "have to become an artist" so that the exportation of the teeth from Russia would be approved. Gov't Trial Ex. 16 at 20, 25, 28, 35.

I therefore DENY judgment of acquittal or a new trial on these grounds.  Even if counsel had raised this defense, I would have found that Manghis was more than a mere one-time or

occasional buyer for personal use.  Therefore, Manghis cannot satisfy the prejudice prong of

Strickland.

## IV.      FALSE STATEMENT COUNTS

The indictment also accuses Mr. Manghis of making false statements to agents of the

Fish and Wildlife Service and National Oceanic and Atmospheric Administration during the

execution of warrants to search his home on February 10 and June 30, 2005.  18 U.S.C. §

1001(a), the statute under which Mr. Manghis was charged, makes it a crime to "knowingly and

willfully . . . make[] any materially false, fictitious, or fraudulent statement" in "any matter

within the jurisdiction of the executive, legislative, or judicial branch" of the U.S. government.

Count nine accuses Mr. Manghis of falsely telling federal agents that two pieces of scrimshaw

were purchased from a seller in California even though Mr. Manghis actually bought the items

from Mr. Mikhalyov, who is based in Ukraine.  Count ten alleges that Mr. Manghis falsely

represented that there were no Russian-origin teeth in his home on June 30, 2005, and count

eleven asserts that Mr. Manghis also lied on that same day by claiming that the sperm whale

teeth that agents had previously seen on February 10, 2005, were no longer present in his home.

The Court convicted Mr. Manghis of counts nine and ten and acquitted him of count eleven.

### A.      Count 11

The Court begins with a brief explanation of its decision to acquit Mr. Manghis of count

eleven.  Agent Guidera testified that during the June 30, 2005, search of Mr. Manghis' home, he

asked Mr. Manghis about the location of the teeth that the agents had seen in their previous

search on February 10, 2005.  According to Agent Guidera, Mr. Manghis responded by saying

that "they were all used up," having been put to use in various restoration projects.  The

government proved that this statement, if it was made, was false.  At least one tooth -- the tooth

with the distinctive design of a swordfish impaling a shark that was introduced into evidence as

Government's Exhibit 27B -- was observed by agents in Mr. Manghis' home on both February

10 and June 30, 2005.  However, the Court concluded that it could not convict Mr. Manghis of

count eleven because it could not determine beyond a reasonable doubt exactly what Mr.

Manghis said on June 30, 2005.  In deciding whether Mr. Manghis made a false statement, the

Court had to rely on the agents' memory, many years after the fact, of the exact language that

Mr. Manghis used in his interview with them.  Since the Court was concerned that the agents

may not have been able to remember the precise words that Mr. Manghis used, and since the

falsity of Mr. Manghis' statement may have hinged on the particular phraseology he employed,

the Court had sufficient doubt as to Mr. Manghis' guilt of count eleven that it felt compelled to

acquit.

### B.       Count 9

The Court's concerns with respect to count eleven, however, do not apply to the crimes

charged in counts nine and ten.  With respect to count nine, Mr. Manghis readily admitted in his

testimony that he told federal agents that he had purchased the scrimshawed pieces identified in

the indictment from a seller in California.  In fact, he contended that the statement was true.

According to Mr. Manghis, he purchased the items from James Saunders, the California

middleman, because he received the shipments from, and made his payments to, Mr. Saunders.

As the Court explained above, supra Part III(B), however, Mr. Saunders was a mere conduit for

the exchange of packages and money.  Mr. Manghis no more purchased the items from Mr.

Saunders than one purchases an item from the shipping company that delivers one's online order

or from the credit card company to which one charges a transaction.  Mr. Manghis directly

negotiated his purchases with Mr. Mikhalyov and contacted him when there were problems with

shipping or with the quality of the teeth he received.  Thus, Mr. Manghis knowingly made a false

statement when he told federal agents that he purchased the teeth referred to in the indictment

from a seller in California since he had actually purchased the teeth from Mr. Mikhalyov, who is

located in the Ukraine.

This statement was material because it had the capacity to influence the government's

decision as to whether Mr. Manghis should be charged with conspiring to import the teeth

contrary to law.  See United States v. Arcadipane, 41 F.3d 1, 7 (1st Cir. 1994) (quoting United

States v. Corsino, 812 F.2d 26, 30 (1st Cir. 1987)), abrogation on other grounds recognized by

United States v. Gonsalves, 435 F.3d 64, 72 (1st Cir. 2006) ("[M]ateriality requires only that the

fraud in question have a natural tendency to influence, or be capable of affecting or influencing,

a governmental function. The alleged concealment or misrepresentation need not have

influenced the actions of the Government agency, and the Government agents need not have

been actually deceived.").  Obviously, if federal agents believed that Mr. Manghis had not

purchased the teeth from a foreign seller and been involved with their importation, they would

not have charged him with the crimes alleged in the indictment.  The fact that Mr. Manghis' lie

did him little good and he was nevertheless indicted do not free him from liability for his false

statement.  See id.

Finally, the statement was made "within the jurisdiction of the executive . . . branch" of

the U.S. government since Mr. Manghis made the statement to agents of the Fish and Wildlife

Service and National Oceanic and Atmospheric Administration who were investigating his

purchases of ivory products from foreign sellers.  See United States v. Rodgers, 466 U.S. 475, 479 (1984) (holding that the term "jurisdiction" in 18 U.S.C. § 1001 "covers all matters confided to the authority of an agency or department," including criminal investigations conducted by federal agencies).  Thus, the Court concludes that the government has proved beyond a reasonable doubt all of the elements necessary to obtain a conviction on count nine of the indictment.

### a.     The Failure to Introduce Question Posed Was Not Error.

Defense now argues, however, that the government was required to introduce evidence of the question posed to elicit this answer or false statement.  Indeed, he argues that their failure to introduce the question that the defendant was asked amounts to a fatal flaw.  The defense cites Bronston v. United States for the principle that whether a question is true or false "must be determined in reference to the question it purports to answer, not in isolation."  409 U.S. 352, 355 n.3 (1973).  Bronston, however, is inapposite.  There, the court was concerned that it was not clear what the defendant was responding to when he allegedly made his false statement.  His answer of "no" could have been made to one of a series of questions and therefore may have been true.  In Mr. Manghis' case, the answer would not be true even if it were made in response to a different question.

Furthermore, the prosecution points out that the First Circuit has interpreted the ruling in Bronston more narrowly:

> The Bronston Court held only that a defendant cannot be convicted of perjury for true but misleading statements, not that a defendant is immune from prosecution for perjury whenever some ambiguity can be found by an implausibly strained reading of the questions he is asked.

United States v. Doherty, 867 F.2d 47, 69 (1st Cir. 1989) (finding no ambiguity in the questions

posed).  In Doherty, however, there was a transcript of the questions asked of the defendant.  Id.

at 69.  The issue was merely how those questions could be construed.  In Manghis' case, there is

no transcript and indeed no testimony at all of the particular questions asked to which he made

his statement that they came from California.  Still, in Doherty as in Bronston, the court was

examining the question of ambiguity because the defendant's answers could be true if construed

as in answer to a different question.

No case has been cited for the proposition that the court must examine the questions

posed when the defendant admits to having made a statement that the court determines to be

unambiguously false.  While it is true that the government introduced no evidence of particular

questions, the defendant admitted to the statement.  Agent Guidera testified, "We discussed the

Russian origin whale's teeth, and Mr. Manghis told us that he had purchased sperm whale teeth

on two occasions from Mr. Saunders and that they were of Russian origin."  Trial Tr. vol. 1, at

61.  Later, he testified, "With respect to the conversation about the Russian origin teeth, Mr.

Manghis told me that he had received them from California, and that they didn't -- that he had

not bought them from overseas, he had not bought them in foreign commerce."  Id. at 64.

Mr. Manghis confirmed Agent Guidera's testimony.  On direct examination, counsel

asked:

> Q:    Did they ask you about Russian teeth?
> A:    Yes, they did.
> Q:    And what did you tell them?
> A:    I told them that I had purchased items from Jim Saunders in
>       California.  I had also purchased Russian teeth on a number of
>       other occasions from Justin Bud Cobb [sic] in Amherst,
>       Massachusetts from the New Bedford Antiques Co-op and from
>       other sources.

-34-

Trial Tr. vol. 3, at 24.  In other words, Mr. Manghis never alleged, as in <u>Bronston</u> or even

<u>Doherty</u>, that the question was ambiguous.  The individual questions were not raised at trial in

this case because the defendant simply agreed that he was asked about the Russian teeth and that

he answered.  (Defense does not raise ineffective assistance on this count.)  He asserted instead

that his answer was true.  And I found that his answer -- that he bought the teeth from California

-- was false.  I DENY the motion for acquittal on this ground as well.

### b.        The Statement Was Not Technically True.

Next, Mr. Manghis argues that even assuming that the questions were unambiguous, the

defendant's statements were literally true.  The evidence showed that the teeth had been mailed

from California.  And Mr. Manghis sent money to Saunders in exchange for the teeth -- thus

"purchasing" the teeth from Saunders.  In other words, the statement may have been misleading,

but it was true.  Misleading is not perjury, as the <u>Bronston</u> court explained:

> It should come as no surprise that a participant in a bankruptcy
> proceeding may have something to conceal and consciously tries to
> do so, or that a debtor may be embarrassed at his plight and yield
> information reluctantly.  It is the responsibility of the lawyer to
> probe . . . It is no answer to say that here the jury found that
> petitioner intended to mislead his examiner.

409 U.S. at 358-59 (finding no false statement where defendant may have misled examiner but

did not necessarily give a false answer to an ambiguous question).

In this case, however, I find that Mr. Manghis' argument was more than misleading.  He

did not actually purchase the teeth from California but actually purchased them from a Ukrainian

seller.  Mr. Manghis placed the order with Russia, checked on delivery problems with Russia,

and contacted Russia when he was concerned with the quality.  Mr. Saunders, I find, was merely

a conduit.  <u>See</u> <u>supra</u> Part III(B).

**C.**     **Count 10**

Next, Mr. Manghis was charged and convicted of a false statement because he told an

agent executing a second warrant that there were no Russian teeth in his home; the execution of

the warrant found an entire bag underneath a towel.  I find that the alleged statement that there

were no Russian-origin teeth in his home on June 30, 2005, was material because it was capable

of influencing the government's investigation of his criminal activities.  Furthermore, the alleged

statement was clearly made "within the jurisdiction of the executive . . . branch" since it was

made to the federal agents searching Mr. Manghis' home.  Also, if Mr. Manghis made the

statement, then he must have known it to be false since his house *did* contain teeth that

originated from Russia, as Mr. Manghis admitted at trial.

The only question, then, was whether Mr. Manghis actually told the agents that there

were no Russian-origin teeth in his home.  Agent Guidera testified that the agents who

interviewed Mr. Manghis asked whether they would find any Russian teeth in his home and Mr.

Manghis said no.  In his testimony, Mr. Manghis admitted that he was asked whether there were

any Russian teeth in his home, but he claims that he answered the agents' question affirmatively,

telling them that there *were* Russian-origin teeth in his house.  The Court is thus left with a he-

said, he-said contest between Mr. Manghis and Agent Guidera, and in this battle of credibility,

Agent Guidera's testimony prevails.  As explained above, the Court found other parts of Mr.

Manghis' testimony incredible, including his claim that he did not purchase teeth from Mr.

Mikhalyov and his statement that the tooth shown in slide 207 of Government's Exhibit 16 is

different than the tooth introduced as Government's Exhibit 27B.  The court thus found beyond a

reasonable doubt that the government has proved all of the elements needed to secure a conviction on count ten.

In his Motion for New Trial or Acquittal, the defendant now argues that Mr. Manghis may have misunderstood the question asked of him. He argues that defense counsel was ineffective in failing to challenge the ambiguous questions that facilitated the alleged false statement. The defendant's argument, however, is based on Mr. Manghis' version of the conversation. He said that Agent Guidera asked him if there were Russian teeth in the house and Manghis responded, "yes, there were Russian teeth in the house. I had two Russian teeth that were right on top of counter, they were right there." Trial Tr. vol. 3, at 113. According to this testimony, Mr. Manghis said that he *did* have two Russian teeth and that those teeth were engraved with Russian carvings. Mr. Manghis said that he thought that Agent Guidera was referring to items with Russian iconography.

This argument fails for two reasons. First, if Mr. Manghis had really misunderstood the question and believed that Agent Guidera was asking about carvings, then he would have responded positively -- indeed he testified that he responded "yes" to the question posed. In that case, Mr. Manghis' argument is not that the question was ambiguous but rather that he did not make a false statement at all, since "yes" would be true in response to either question. I already considered these facts at trial and believed Agent Guidera's testimony over Mr. Manghis. Agent Guidera said that Manghis had answered, "No," to his question. And indeed "No" would have been false in response to *either question* (whether Guidera was referring to Russian carvings or Russian teeth).

Second, the misunderstanding is simply implausible.  Mr. Manghis knew that they were executing a search warrant to look for teeth that were bought illegally.  There would have been no reason at all to think that they were looking for teeth with Russian iconography.

Defense counsel therefore did not err by not challenging the ambiguous questions; and even if he did, it would not have prejudiced the case since I find that Mr. Manghis' testimony was simply not credible.  Again, at this stage, I am to evaluate all credibility questions in favor of the verdict.

## V.   LESSER INCLUDED OFFENSE

In his Motion for New Trial or Acquittal, the defendant argues that the court erred by not giving itself a lesser-included offense instruction, and that the defense counsel was ineffective for failing to request such an instruction.  The defendant argues that 16 U.S.C. § 3373(d)(2) of the Lacey Act, which imposes a negligent mens rea standard rather than a "knowing" standard for taking/possessing/importing wildlife in violation of CITES, is a lesser-included offense of the smuggling act, 18 U.S.C. § 545.  In other words, Mr. Manghis should be convicted of importing sperm whale teeth and elephant ivory that he *should have known* had been taken in violation of CITES, rather than *knowingly* importing sperm whale teeth and elephant ivory when he *knew* that the importation was contrary to law.  As I will explain, § 3373(d)(2) is a lesser-included offense of § 3372(d)(1) of the Lacey Act but *not* a lesser-included offense of § 545.

As I have explained, supra Part II, the CITES treaty regulates international wildlife trade and delineates the species that are threatened with extinction and whose importation is banned or heavily regulated.  CITES, however, has no internal enforcement mechanism.  In the United States, it is enforced by provisions of the Endangered Species Act, the Lacey Act, administrative

regulations, and general Title 18 criminal offenses, such as smuggling.  A person who violates

CITES, therefore, may be prosecuted under one or more of these statutes.  See, e.g., United

States v. McNab, 331 F.3d 1228 (11th Cir. 2003) (one defendant found guilty of conspiracy,

smuggling, Lacey Act violations, and money laundering).

The Lacey Act, which was not charged, makes it unlawful to "import, export, transport,

sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or

sold in violation of any law, treaty, or regulation of the United States [i.e. CITES]."  16 U.S.C. §

3372(a).  The Lacey Act includes two offenses, a felony offense that requires actual knowledge

that the importation was illegal (§ 3373(d)(1)), and a lesser-included misdemeanor offense that

requires only that the defendant *should* have known that it was illegal (§ 3373(d)(2)).  See 16

U.S.C. §§ 3373(d)(1)-(2); United States v. Cook, 81 F.3d 170, 170 (9th Cir. 1996).

Mr. Manghis argues that this second offense is a lesser-included offense of the crime

with which he *was* charged, smuggling, which prohibits the knowing importation of merchandise

contrary to law.  18 U.S.C. § 545.  A defendant is entitled to a lesser-included offense instruction

where: "(1) the lesser offense is included in the offense charged, (2) a contested fact separates

the two offenses, and (3) the evidence would permit a jury rationally to find the defendant guilty

of the lesser offense and acquit him of the greater."  United States v. Boidi, 568 F.3d 24, 27 (1st

Cir. 2009) (internal quotations and citations omitted).

The threshold issue is whether the misdemeanor provision of the Lacey Act is indeed a

lesser included offense of smuggling.  A  lesser included offense is an offense whose elements

are entirely subsumed by the charged offense.  See United States v. Flores, 968 F.2d 1366, 1369

(1st Cir. 1992).  The government argues that the misdemeanor provision of the Lacey Act is not

a subset of the offense of smuggling; it is a subset of the felony provision of the Lacey Act.

Compare United States v. Fejes, 232 F.3d 696, 703 (9th Cir. 2000) ("There is no dispute that

misdemeanor violations of the Lacey Act are lesser-included offenses [of the felony

provisions].") with United States v. Lawson, 2010 WL 1735368, at *3 (9th Cir. Apr. 29, 2010)

(misdemeanor provision of the Lacey Act is not a lesser-included offense of smuggling).

Because smuggling prohibits the importation of "*merchandise*" in violation of law and the Lacey

Act prohibits the importation, exportation, transportation, receipt, acquisition, or purchase of

"*fish or wildlife or plant,"* a person could commit one offense without committing the other.  Id.

And where the offenses are not substantially comprised of the same elements, one cannot be a

lesser included offense of the other.  Schmuck v. United States, 489 U.S. 705 (1989).

The defendant counters that while the Lacey misdemeanor may not *always* be a lesser

included offense of smuggling, it is a lesser included offense *in this case*.  Here, the defendant

was charged with: I) knowingly; ii)  importing; ii) whale teeth and ivory; iv) in violation of law.

*In this case*, the elements of the Lacey Act and smuggling are identical, because the

"merchandise" here is wildlife and the means is "importing."  And therefore the only difference

between the two crimes is the defendant's level of knowledge of the law -- precisely the type of

"extra element" to render one a lesser-included offense of the other.  Admittedly, the defendant's

argument is appealing in this particular case.

The Supreme Court and the First Circuit, however, require a more formulaic analysis of

the elements and statutory interpretation to evaluate whether one offense constitutes a lesser

included offense of another or whether its prosecution would result in double jeopardy.  The

court is to apply an "Elements Test" or textually compare the criminal statutes to determine

whether one offense requires an additional element which the other does not.  Blockburger v.

United States, 284 U.S. 299, 304 (1932); Schmuck, 489 U.S. at 716-21 (applying the elements

test to lesser-included offense analysis).  This test results in predictable outcomes.  See Carter v.

United States, 530 U.S. 255, 261 (2000).

I cannot, as the defendant asks, consider the factual context of the case at bar.  United

States v. Patel, 370 F.3d 108, 117 (1st Cir. 2004) ("[W]e generally do not conduct a Blockburger

analysis by considering the facts of the case at hand.").  I must instead "parse the statutes apart

from the facts of any particular case."  United States v. Corona, 108 F.3d 565, 572 (5th Cir.

1997).  And where I read the statute apart from the facts in this particular case, I must agree with

the government and the Ninth Circuit that they do not in fact share the same elements.  See

Lawson, 2010 WL 1735368, at *3.  The defense counsel did not err in failing to raise it; and I did

not err in failing to consider the instruction.

## VI.    APPROPRIATE OFFENSE CHARGED

Had the defendant been charged with a violation of the felony provision of the Lacey

Act, he could have requested a lesser included offense instruction of the misdemeanor.[14]  Indeed,

the defendant argues that he *should* have been charged under the Lacey Act because it is more

specific than the smuggling statute.  The defendant cites Palmero v. United States, in which the

First Circuit held that the Opium Act replaced the prerequisite of the smuggling act (the Tariff

Act of 1930), such that the word "merchandise" in that act no longer included opium.  112 F.2d

922, 925 (1st Cir. 1940).  The court looked to the legislative history of the Opium Act and

---

[14] I should note that even if he had been charged under the Lacey Act, I would not have given such an instruction, since the evidence in this case was more than sufficient that Mr. Manghis *knew* that he was violating the law.  In this case, the evidence would not have permitted a fact finder to "rationally to find the defendant guilty of the lesser offense but acquit him of the greater."  United States v. Boidi, 568 F.3d 24, 27 (1st Cir. 2009).

determined that Congress intended that the Tariff Act no longer apply to opium.  Id.  Similarly,

Mr. Manghis argues, where the defendant is charged with unlawfully importing wildlife, he must

be charged under the more specific and subsequent Lacey Act and not under the general

smuggling statute.  His conviction should therefore be voided.[15]

The Ninth Circuit was faced with a similar argument in United States v. Lee, 937 F.2d

1388 (9th Cir. 1991).  Defendants charged with smuggling salmon into the United States argued

that the smuggling act no longer applied to wildlife.  When Congress passed the Lacey Act, the

defendants argued, Congress "intended to withdraw fish and wildlife from the definition of

'merchandise' in 18 U.S.C. § 545."  Id. at 1397.  The Ninth Circuit disagreed.  They looked to the

legislative history of the Lacey Act and determined that Congress had actually intended the

Lacey Act to *complement* the smuggling statute rather than to replace it.  Id.  As they enacted the

Lacey Act, Congress noted that the "felony penalty scheme for unlawful importations of wildlife

is consistent with existing customs law.  Even if this Act provided only a misdemeanor penalty

for the unlawful importation of wildlife, such importations would be felonies under the customs

law which prohibits knowing importations 'contrary [to] law.'" S. Rep. No. 97-123, at 11,

*reprinted in* 1981 U.S. Code Cong. & Admin. News 1748, 1758 (citing 18 U.S.C. § 545).

Congress clearly envisioned that the Lacey Act would coexist and complement -- however

awkwardly -- the existing smuggling laws.  Accordingly, I find that the government was free to

bring smuggling charges against the defendant and will not void the conviction on this ground.

---

[15] Mr. Manghis' argument seems to be predicated on the assumption that the penalties under the Lacey Act are less severe than the smuggling statute.  Interestingly, the same Sentencing Guideline applies to both offenses. The Guideline governing "Offenses Involving Fish, Wildlife, and Plants" (§ 2Q2.1) applies to smuggling as well as to 16 U.S.C. § 3373(d).  And the Guideline makes no distinction between the felony and misdemeanor provisions of the Lacey Act, § 3373(d)(1) and (2).

## VII.    CONCLUSION

This is a very troubling case.  Mr. Manghis is obviously a talented artist, and his scrimshawed works are quite beautiful.  The Court, however, concludes that in his quest to find new pieces of ivory on which to practice his art, Mr. Manghis violated federal law.  Then, when federal agents began to uncover his activities, he lied in a vain effort to cover his tracks.  Thus, the Court finds Mr. Manghis guilty as charged on counts one through seven, nine, and ten.

For the reasons set forth above, Defendant's Motion for New Trial (**document #110**) is **DENIED**; Defendant's Motion for a Judgment of Acquittal Or, in the Alternative, a New Trial (**document #131**) is **DENIED**.

**SO ORDERED.**

**Date:  May 26, 2011**          _/s/ Nancy Gertner_

                    **NANCY GERTNER, U.S.D.J.**